# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

RICHARD WOOD,

                 Plaintiff,

    v.

MAINE TURNPIKE AUTHORITY,

             Defendant.

Civil Action No:

## Complaint and Demand for Jury Trial
## and Injunctive Relief Sought

Richard Wood hereby complains against the Maine Turnpike

Authority (MTA) as follows:

### Summary Of The Action

1.    Richard Wood, a seasonal Highway Maintenance Worker for

the MTA, successfully and safely performed his job for ten years.  The

MTA abruptly ended his employment in November 2010 solely because it

wrongly regarded his non-symptomatic hernia – diagnosed in September

2008 – as suddenly disabling him.  In 2008 and 2009, Wood's treating

doctor  advised the MTA that Wood's small hernia would not prevent him

from safely performing all of his job duties without restrictions – including lifting up to 100 pounds. During the winters of 2008-09 and 2009-2010, Wood safely performed all his lifting job duties for the MTA.

2.      In the summer of 2010, however, the MTA adopted an illegal policy of not "accepting recommendations or clearances from [an individual's] personal physician." It required instead that all seasonal employees pass a return-to-work physical by Bayside Employee Health ("Bayside"), the MTA's own doctor, or else lose their jobs. During Wood's November 1, 2010 physical, the Bayside doctor would not allow Wood to test lifting up to 100 pounds because of his hernia, and Bayside notified the MTA for the third year in a row that Wood could not safely lift more than 25 pounds. Based solely on Bayside's opinion , the MTA summarily terminated Wood's employment. The MTA failed to consider the opinions of Wood's treating doctor and did not offer Wood the option of requesting an independent second opinion, or any other method of contesting Bayside's refusal to clear him to work.

3.      The MTA's blanket policy of refusing to give any consideration to the opinions of employees' treating doctor violates its

legal obligation to perform an individualized assessment based on the best available medical and scientific evidence. The MTA also violated its legal obligation to make an individualized assessment of an employee with a health impairment regarding (a) the probability that the employee will be harmed performing the job because of that impairment; (b) the nature and severity of the potential harm to the employee; and (c) the imminence of the potential harm. Because of the MTA's intentional and unlawful disability discrimination and denial of reasonable accommodation for disability, Wood is seeking lost wages and benefits, compensatory damages, declaratory and injunctive relief, and attorneys' fees and expenses.

### Parties

4.      Plaintiff Richard Wood is a citizen of the United States of America and a resident of the Town of Eliot, York County, State of Maine.

5.      Defendant Maine Turnpike Authority ("MTA" or "Employer") is a body both corporate and politic headquartered in the City of Portland, Cumberland County, State of Maine.  The MTA was created by an act of the Maine Legislature during 1941, and it constructs,

reconstructs and maintains the section of Interstate Route 95 that extends from Kittery, Maine, to West Gardiner, Maine.

6.      During Wood's employment, including in 2010, the MTA received and accepted federal financial assistance from the federal government.

7.      The MTA's receipt of federal financial assistance makes it subject to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

**Jury Trial Demand**

8.      Under Fed. R. Civ. P. 38(b) and Rule 38 of the Rules of the Court, Wood demands trial by jury on all issues.

**Jurisdiction and Venue**

9.      The Court has proper subject matter jurisdiction over the Plaintiff's claims under 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights).

10.      Venue is proper in the District of Maine under 28 U.S.C. § 1391.  Under Rule 3(b) of the Rules of this Court, this action is properly filed in Portland because the case arises in York and Cumberland Counties where Plaintiff was employed by Defendant.

## Factual Allegations

11.     Wood began working for the MTA in December 2000 as a full-time seasonal Highway Maintenance Worker.

12.     Wood was assigned to the York Highway Maintenance camp.

13.     The MTA requires full-time seasonal Highway Maintenance Workers to be able to lift up to 100 pounds occasionally.

14.     The MTA's written job description for full-time seasonal Highway Maintenance Workers provides in part as follows: "The employee could occasionally lift and/or move up to 100 pounds."

15.     From 2000 through 2009, the MTA required Wood and other winter seasonal employees to undergo a "return-to-work physical" at Bayside in Portland, Maine, before they started work.   From 2000 through 2009, the MTA also accepted recommendations or clearances from individuals' treating doctors regarding their fitness for duty.

16.     Wood was diagnosed by Bayside on about September 4, 2008 with an inguinal hernia on the right side.

17.     In September 2008 Wood reported to Bayside that he had no symptoms from the hernia.

5

18.     Before September 2008, Wood was not aware of his inguinal hernia on the right side.

19.     Inguinal hernias are common in men with a lifetime risk of about 27%.

20.     In asymptomatic or minimally symptomatic cases of inguinal hernias, it is reasonable for doctors to recommend against corrective surgery because of the low risk of serious complications (less than about .2% per year) and the significant risk (about 10–12%) of serious complications from the surgery itself.

21.     From on or before 2007 to the present, medical research and standards of care supported the reasonableness of the approach of watchful waiting instead of immediate surgery in patients with asymptomatic or minimally symptomatic inguinal hernias.

22.     Based solely on the presence of the asymptomatic inguinal hernia, on September 4, 2008 Bayside refused to clear Wood to lift up to 100 pounds even though it had done so the prior three years. Instead, it imposed a new lifting restriction of up to 25 pounds only.

23.     On September 10, 2008 Wood discussed in person with his primary care doctor, William K. Gilbert, MD, his inguinal hernia on the right side.  After examining the hernia, Dr. Gilbert recommended against surgery and instead recommended watchful waiting.

24.     On September 10, 2008 Dr. Gilbert sent Bayside a note dated 9/10/2008 stating: "I examined Richard Wood 9/10/08  He does have the beginning of a very small inguinal hernia on the right. There is no reason to limit lifting because of this. He is perfectly capable of lifting 100 lbs." This handwritten note was signed by Dr. Gilbert.

25.     On about October 14, 2009, Wood again discussed in person with Dr. Gilbert the inguinal hernia.  After examining the hernia, Dr. Gilbert again recommended against immediate surgery and instead recommended watchful waiting.

26.     In September 2008, October 2009, and November 2009, the MTA received notes from Wood's primary care physician, Dr. William Gilbert, stating that Wood need not limit his activities or lifting and could lift up to 100 pounds.

27.     Based on Dr. Gilbert's 2008 and 2009 notes clearing Wood to lift up to 100 pounds, the MTA continued to employ Wood through the 2008-09 and 2009-10 winter seasons despite the opinion of Bayside that he could only  lift up to 25 pounds.

28.     As of November  2010, Wood had worked for the MTA as a seasonal Highway Maintenance Worker for 10 consecutive winter seasons.

29.     Wood always did the lifting asked of him in his MTA job without any problems or difficulties.

30.     In his work for the MTA, Wood did lift as much as 100 pounds without any problems or difficulties.

31.     While Wood worked for the MTA, he earned only positive performance evaluations  recognizing him for consistently meeting expectations and in some instances exceeding expectations.

32.     Wood never received any unfavorable performance evaluations .

33.     In about the late summer of 2010, Wood received a mailing from the MTA directed to all returning seasonal Highway Maintenance Workers.

8

34.     This mailing from the MTA to Wood  included a notice explaining that returning seasonal Highway Maintenance Workers were required to undergo a "return-to-work physical" at Bayside before starting work.  The notice included, in bold text, the following statement:  "Also, you must be cleared to work by Bayside.  We will not be accepting recommendations or clearances from your personal physician."

35.     After receiving this notice, Wood made an appointment with Bayside for November 1, 2010.

36.     On about October 15, 2010, Wood for a third time discussed in person with Dr. Gilbert the inguinal hernia.  After examining the hernia, Dr. Gilbert again recommended against immediate surgery and instead recommended watchful waiting.

37.     Dr. Gilbert's notes of Wood's October 15, 2010 office visit report in part as follows: "right inguinal hernia again is not changed there is no pain. He is very active able to lift. He was going to work for turnpike authority again this year. He will have to do a physical with them. His hernia should not limit his ability to work for the turnpike authority."

38.     Wood underwent a "return-to-work physical" at Bayside on November 1, 2010.  During that appointment, when it came time to test Wood's capacity to lift weight, the Bayside doctor (Dr. Susan Upham) would not permit him to attempt the lift test for any amount of weight.

39.     Wood explained to the Bayside doctor that he could lift 100 pounds, and that his treating doctor allowed him to lift that much, and he asked that he be allowed to at least attempt to test his lifting up to 100 pounds.  Nonetheless, the Bayside doctor continued to refuse to permit him to attempt the lift test for any amount of weight.

40.     That same day, the Bayside doctor informed an employee in the MTA Human Resources office by telephone that she was recommending that Wood be restricted to lifting no more than 25 pounds and that she did not allow him to perform the lift test portion of the examination.

41.     The Bayside doctor completed a form dated November 1, 2010, on which she checked the following choice under "Preplacement Examination":  "The applicant may perform the tasks related to this job with the following accommodations or job training:  25 lb lift max pending

10

resolution of a medical condition." The MTA received this form on November 4, 2010.

42.     The MTA sent Wood a letter dated November 5, 2010 stating it could not employ him because he was "unable to pass" the required physical examination for his position and could not "safely perform the requirements of this position."

43.     On November 8, 2013, Wood's primary care physician examined him and determined that his inguinal hernia was stable and asymptomatic. Once again, corrective surgery was not recommended and no lifting restrictions were imposed or suggested.

44.     When the MTA notified Wood in November 2010 of the termination of his employment, it subjected him to an adverse action because of an actual or perceived physical impairment.

45.     As of November 2010, Wood had his hernia for at least two years. His hernia had a duration of more than six months.

46.     The MTA's decision in November 2010 to stop employing Wood was based on the unsubstantiated fear that he might at some

indefinite point in the future worsen his hernia by attempting to lift up to 100 pounds.

47.     In November 2010 the MTA refused to employ Wood and terminated his employment based on qualification standards that screened out or tended to screen out an individual with a disability or a class of individuals with a disability and that were not job-related or consistent with business necessity.

48.     In November 2010 the MTA conditioned Wood's employment, and refused to employ him, based on the results of a medical examination that was not job-related or consistent with business necessity.

## Legal Claim

### (Disability Discrimination and Denial of Reasonable Accommodations)

49.     The allegations in paragraphs 1 - 48 are repeated.

50.     The MTA has intentionally discriminated against Richard Wood because of his disabilities and denied him reasonable accommodations for his disabilities, in violation of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 794.  Among other things, the MTA:

(a) in November 2010 refused to employ Wood and terminated his employment because of an actual or perceived physical impairment;

(b) in November 2010 refused to employ Wood and terminated his employment  based on a vague and unsubstantiated fear of future injury to Plaintiff;

(c) in November 2010 refused to employ Wood and terminated his employment based on qualification standards that screened out or tended to screen out an individual with a disability or a class of individuals with a disability and that were not job-related or consistent with business necessity; and

(d) in November 2010 conditioned Wood's employment and refused to employ based on the results of a medical examination that was not job-related or consistent with business necessity.

51.    Wood is pursuing all possible methods of proving this discrimination, including but not limited to, circumstantial evidence and direct evidence.

52.     As a direct and proximate result of the MTA's intentional discrimination against the Plaintiff, he has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of his job and of his life, injury to reputation, and other pecuniary and non-pecuniary losses.

53.     Plaintiff requests relief against Defendant as follows:

(a)     Enter declaratory relief that Defendant violated Plaintiff's statutory civil rights to be free of disability discrimination;

(b)     Enter injunctive relief ordering Defendant to:

(1) reinstate Plaintiff to the most suitable full-time seasonal Highway Maintenance Worker position;

(2) provide Plaintiff with reasonable accommodations for his disabilities, including but not limited to allowing him to test lifting up the specified weight limit for his position in any "return-to-work physical" or modification of his job duties to restrict lifting to the maximum weight specified by the doctor(s) performing required "return-to-work physicals;"

14

(3) rescind the policy it adopted in 2010 under which it would not "accept[] recommendations or clearances from [an individual's] personal physician;"

(4) post at each of its worksites a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief;

(5) send a letter printed on Defendant's letterhead and signed by the Chair of Defendant's Board of Directors to all of Defendant's employees advising them of the judgment against it in this case, enclosing a copy of its policies regarding reasonable accommodations and prohibiting disability discrimination, and stating that it will not tolerate any such discrimination or denial of reasonable accommodations, and will take appropriate disciplinary action against any employee or agent of Defendant who engages in such discrimination;

(6) provide effective civil rights training for all managerial and supervisory employees and members of Defendant's Board of Directors on the requirements of all applicable laws prohibiting employment

15

discrimination because of disability and that this training must be completed within 60 days of the entry of Judgment for Injunctive Relief;

(7) provide this training for two years after the date judgment is entered to all new managerial and supervisory employees and members of Defendant's Board of Directors within 60 days of their hire, promotion, election or appointment into a position with responsibility for employees;

(8) maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

(c)     Award Plaintiff back pay for lost wages and benefits and prejudgment interest thereon and reinstatement, or,  front pay for future lost wages and benefits;

(d)     Award Plaintiff compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(e)     Award Plaintiff his full costs and reasonable attorneys' fees; and

(f)     Award Plaintiff such further relief as is deemed appropriate.

16

Date:  October 29, 2014    Respectfully submitted,

           /s/ David G. Webbert
           David G. Webbert, Esq.

           /s/ Roberta L. de Araujo
           Roberta L. de Araujo, Esq.

           Johnson, Webbert & Young,  LLP
           160 Capitol Street, Suite 3, P.O. Box 79
           Augusta, Maine 04332-0079
           Tel: 207-623-5110
           dwebbert@johnsonwebbert.com
           rdearaujo@johnsonwebbert.com

           Attorneys for Plaintiff